# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS October 18, 2012
### EASTERN DIVISION

| | | |
|---|---|---|
| JUAQUIN WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 5937 |
| | ) | |
| JAQUELYN KITT, | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Juaquin Walker ("Petitioner") brings this action for the return of his daughter ("Child") to Israel under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11 ("Hague Convention" or "Convention"), and implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"). (R. 1, Pet.) Petitioner claims that Jaquelyn Kitt ("Respondent"), the Child's mother, wrongfully retained the Child in violation of the Convention and ICARA. Petitioner seeks the Child's return to Israel. Respondent denies that retention of the Child was wrongful and asserts several affirmative defenses. (R. 35, Am. Resp. to Pet.) The Court held an evidentiary hearing on these matters on October 11, 2012. For the reasons stated below, the Court grants the petition and orders the prompt return of the Child to Israel in accordance with Petitioner's rights of custody.

## FINDINGS OF FACT[1]

---

[1] Many of the relevant facts were stipulated to in the parties' joint pretrial order, which was entered into evidence at the October 11 evidentiary hearing. (Tr. at 4.) There are no factual disputes in this case that are material to the application of the Hague Convention. In this section,

Petitioner and Respondent both joined the Black Hebrew Israelite community in Dimona, Israel ("the Community") in the 1970's, as children. (Jt. Order.) Members of the Community recite vows each year in which they promise not to question the judgment of the leader of the Community, who is considered to be the spiritual Messiah. (Tr. at 17-18.) The Community permits polygamous marriage, and the Israeli government recognizes such marriages as legitimate. (Jt. Order.) In general, women in the Community are subservient to men.[2] (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) A woman's path in life consists of getting married and serving her husband. (*Id.*) Petitioner testified that if a woman acts not in accordance with her husband's wishes, she should be punished. (Tr. at 21-22.) Respondent testified that women are not able to express themselves in the Community. (*Id.* at 40.) Several additional witnesses testified that women in the Community do not have the ability to make decisions governing their

the Court has distilled the relevant portions of the parties' pleadings and affidavits and testimony from the evidentiary hearing in order to provide context for its conclusions of law.

[2] Respondent also alleges that "improper touching of women" may occur within the Community without punishment of the aggressors. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) However, Respondent does not contend that Petitioner or his first wife, or anyone else in the Community, have ever abused or neglected the Child. Suggestions that some women in the Community are abused and their attackers are not vigorously prosecuted or punished are not relevant to the determination of whether the Child faces a grave risk of harm or an intolerable situation. *Baxter v. Baxter*, 423 F.3d 363, 374 (3d Cir. 2005) (holding that no grave risk of harm existed where there were no allegations of abuse by either parent and the only evidence supporting the Article 13(b) exception involved "run-ins with hostile residents [of the community the family lived in], and the stress of living in a community troubled by racial and domestic violence and petrol sniffing"); *see Vazquez v. Estrada*, 3:10-CV-2519-BF, 2011 WL 196164, at *5 (N.D. Tex. Jan. 19, 2011) (finding that evidence of "spiraling violence and surges in murders" in Petitioner's city of residence and "specific violent acts that have been committed in the school [the child] attended" were not sufficient to prove a grave risk of physical harm to the child). Accordingly, the Court partially granted Petitioner's motion *in limine* (R. 45) and excluded testimony regarding general allegations of abuse in the Community as irrelevant to the present matter. (Tr. at 2-3.)

own lives, but that the leader and the men make the decisions. (*Id.* at 26-27, 55-60, 68.)

Respondent began to pursue Petitioner when she turned seventeen and was of age to be allowed by the Community to do so. (*Id.* at 56.) On April 30, 2003, Respondent married Petitioner, becoming his second concurrent wife. (Jt. Order.) Petitioner has six children with his first wife. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Before they married, Petitioner's first wife slapped and spat on Respondent. (R. 35, Am. Resp. to Pet. at 2.) Respondent testified that after the marriage, she continued to be disrespected and verbally abused by Petitioner's first wife, and that she was treated like a servant by Petitioner and his first wife. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Respondent gave birth to the Child in Israel in September 2004. (*Id.*) Respondent moved out of Petitioner's house in May 2005, but after Petitioner reported her action to Community officials, she moved back in. (Tr. at 32-33.) In October 2005, Respondent again moved out of Petitioner's house and into her father's, taking the Child with her. (*Id.*; R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Petitioner ordered Respondent to return to his house, but she refused. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.)

In October 2005, shortly after she moved out of Petitioner's house, the Community leadership requested that Respondent travel to the United States to work in one of the Community's restaurants. (Tr. at 33-34.) She explained to Petitioner and several members of the Community leadership that she did not want to be separated from her daughter, but she was told to go anyway. (*Id.*) Respondent believed that if she did not obey the Community leadership, she may be expelled from the Community. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Respondent left Israel to come to the United States at the request of the Community leadership in December 2005. (Jt. Order.) She returned to Israel in May 2007 and stayed with her sister. (R.

3

35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Respondent and Petitioner were not on speaking terms, and the Child stayed with Respondent at her sister's. (Tr. at 35.) Respondent returned to the United States in August 2007. (Jt. Order.) She again visited Israel in June 2009. (*Id.*) She stayed in Israel for six months, and the Child stayed with her during this period. (Tr. at 36-37.) Respondent's mission ended in 2009, (*Id.* at 52), yet she returned to the United States in December 2009. (Jt. Order.) Respondent returned to Israel in June 2011, and she remained there until she left for the United States with the Child in September 2011. (*Id.*)

In a declaratory judgment action in September 2011, an Israeli family court issued an order, based on DNA testing, declaring Petitioner's paternity of the Child.[3] (*Id.*) The Child is currently eight years old. (*Id.*) She lived in Israel her entire life until Respondent brought her to the United States in September 2011. (*Id.*) She has a good relationship with Petitioner and did well in school in Israel. (R. 1, Pet. at 6.) While in Israel, the Child lived exclusively with Petitioner in his home in Dimona, with two exceptions: (1) from October 2005 to December 2005, the Child lived with Respondent away from Petitioner's home; and (2) from December 2005 to May 2007, she spent many nights a week with Petitioner's mother at her home. (Jt. Order.)

Petitioner and Respondent agreed that the Child would visit the United States with Respondent until the end of the Jewish holiday season in November 2011. (*Id.*) Petitioner and Respondent reported to the Child's school and the United States Embassy in Israel that the Child

---

[3] As far as the Court can tell, there did not seem to be any doubt that Petitioner is the Child's father. The DNA testing appears to have been a formality undertaken pursuant to the Israeli court proceeding related to the parties' preparations for the Child's trip to the United States. (*See* Tr. at 12.)

would return to Israel after less than two months. (*Id.*) Respondent and the Child resided in the Washington, D.C. area from September 2011 until the filing of the instant action in July 2012. (*Id.*) Respondent testified that, once in the United States, the Child "began to cry regularly, saying she did not want to go back to Israel, but that she wanted to stay with [Respondent] in the U.S. instead." (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) In late October, Petitioner requested that Respondent's brother, who was planning a trip to Israel, bring the Child with him. (*Id.*) Respondent understood the agreement to entail Petitioner's coming to the United States to retrieve the Child and did not allow the Child to return to Israel with Respondent's brother. (*Id.*) In November 2011, Respondent retained the Child beyond the two-month visit that she and Petitioner had agreed upon. (Jt. Order.) Respondent testified that she received phone calls from Petitioner's family informing her that Petitioner was planning on kidnaping the Child. (Tr. at 38.) Petitioner flew to Washington, D.C. and requested to meet with Respondent and take physical custody of the Child. (Jt. Order.) After three days of such requests, Respondent met with Petitioner on November 19, 2011. (*Id.*) She did not bring the Child, and she expressed her concerns to Petitioner about the Child returning to Dimona. (*Id.*) Respondent and the Child called Petitioner on November 20 to ask him when he wanted to meet to visit the Child, but Petitioner said he was already on his way to Chicago. (*Id.*) Petitioner returned to Israel at the end of November 2011. (*Id.*) Petitioner and the Child have had regular phone and Skype contact since November 2011. (*Id.*) Respondent did not tell Petitioner where she and the Child were living in the United States. (Tr. at 46-47.) In July 2012, Respondent informed Petitioner that she and the Child were coming to Chicago to visit Respondent's family, and she arranged to visit him when they arrived. (*Id.* at 53.) Because Respondent was considered a flight risk, Petitioner's

5

Emergency Petition for Warrant of Arrest was granted and Petitioner was given temporary

custody of the Child pending resolution of his petition for her return. (R. 9, Order.)

## CONCLUSIONS OF LAW

The Hague Convention, a treaty to which both the United States and Israel are signatories,

was adopted to respond to the problem of international child abductions during domestic

disputes. *Abbott v. Abbott*, 130 S.Ct. 1983, 1987 (2010) (citing Hague Convention, art. 1). The

drafters of the Convention's provisions sought to address the scenario in which one person,

usually a parent, removes a child to or retains a child in a country that is not the child's habitual

residence in order to "obtain a right of custody from the authorities of the country to which the

child has been taken." Elisa Pérez–Vera, *Explanatory Report*, Hague Conference on Private

International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, ¶ 13

(1982) (hereinafter, "Pérez–Vera Report").[4] The Convention thus seeks "to ensure that the rights

of custody and of access under the law of one Contracting State are effectively respected in the

other Contracting States" by securing the "prompt return of children wrongfully removed to or

retained in any Contracting State." *Abbott*, 130 S.Ct. at 1987. It provides "that a child abducted

in violation of 'rights of custody' must be returned to the child's country of habitual residence,

unless certain exceptions apply." *Id.*

One of the objects of the Hague Convention is to ensure that States respect the custody

---

[4] The Pérez–Vera Report is "recognized by the [Hague] Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Koch v. Koch*, 450 F.3d 703, 711 n.4 (7th Cir. 2006). Many circuits treat the Pérez–Vera Report "as an authoritative source for interpreting the Convention's provisions." *Id.* (citations omitted). The Pérez–Vera Report is available at http://www.hcch.net/upload/expl28.pdf.

laws and proceedings of other States. Hague Convention, art. 1; *see also* Pérez–Vera Report at ¶ 34. To discourage forum shopping by parents who believe they are more likely to find a sympathetic court in a different country, "the Convention requires that the determination of whether the child's removal was wrongful must be made under the laws of the country in which the child has his or her 'habitual residence.'" *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th Cir. 2008) (citation omitted). Importantly, "[a]n action under the Convention and ICARA is not an action to determine the merits of custody rights," *Koch*, 450 F.3d at 711, and a court's inquiry is limited to the merits of the abduction claim; the court is not to determine the merits of the underlying custody battle. *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004). "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch*, 450 F.3d at 711. Thus, the issue presently before the Court is a very narrow one: the Court must determine whether the Child should return to Israel with her father or remain in the United States with her mother pending a custody determination.

Initially, Petitioner must establish by a preponderance of the evidence that the Child has been wrongfully removed within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A); *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (*Friedrich I*). He must do this by proving that (1) Respondent removed the child from her "habitual residence," and (2) Petitioner was exercising his parental custody rights, under the law of the State of the child's habitual residence, over the child at the time of her removal. *Id.* If Petitioner meets this burden, the Child must be returned unless Respondent establishes one of four exceptions provided for in the Convention. Hague Convention, arts. 12, 13, 20; 42 U.S.C. § 11603(e)(2)(A)-(B). To do so, Respondent must overcome the strong presumption that a child should be returned to her country

7

of habitual residence. *See Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000). Here, Respondent argues for the application of three different exceptions. (R. 32, Resp't Mot.)

The first affirmative defense Respondent raises, the "age and maturity" exception, requires proof by a preponderance of evidence that the Child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13; 42 U.S.C. § 11603(e)(2)(B). Respondent's second affirmative defense is provided for under Article 13(b) of the Hague Convention. It requires proof by clear and convincing evidence that the child should not be returned to her country of habitual residence because she faces a "grave risk" of "physical or psychological harm," or an otherwise intolerable situation. 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 13(b). The third affirmative defense Respondent raises requires her to prove by clear and convincing evidence that the Child's return to Israel "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; 42 U.S.C. § 11603(e)(2)(A).

The Court first addresses whether Petitioner has established a case of wrongful retention[5]

---

[5] Technically, because Petitioner agreed to a temporary visit to the United States, this is a case of wrongful retention rather than wrongful removal. The removal of the Child from Israel was not wrongful or in violation of Petitioner's custody rights because he consented, as stipulated by the parties in their pre-trial motion. Because wrongful removal and wrongful retention are treated identically under Article 3 and much of the literature, and because the parties to this suit use both "removal" and "retention" throughout their briefs, the Court will use these terms interchangeably here. Under the Convention, a determination that a retention is wrongful has the same consequences as a determination of a wrongful removal—mandatory return of the child, unless one of the exceptions apply. Pérez–Vera Report at ¶ 12 ("Naturally, a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category [as a removal of a child from its habitual environment].")

and then turns to the defenses asserted by Respondent.

## ANALYSIS

**I.      Wrongful Retention**

To obtain relief under the Hague Convention, Petitioner must establish by a

preponderance of the evidence that the Child was wrongfully retained. Hague Convention, art.

12; 42 U.S.C. § 11603(e)(1)(A). The Convention provides:

The removal or the retention of a child is to be considered wrongful where –

*a)* it is in breach of rights of custody attributed to a person, an institution or any other
body, either jointly or alone, under the law of the State in which the child was
habitually resident immediately before the removal or retention; and

*b)* at the time of removal or retention those rights were actually exercised, either
jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 13. Petitioner contends that he has established a *prima facie* case of

wrongful removal because he proved by a preponderance of the evidence that the Child's

habitual residence before her removal was Israel, that the removal violated Petitioner's custody

rights under Israeli law, and that he was exercising his custody rights at the time of the Child's

removal. (R. 1, Pet. at 9-12.) In response, Respondent requested an evidentiary hearing to

determine whether the Child was wrongfully removed from Israel. (R. 35, Am. Resp. to Pet. at

6.) Such a hearing was held on October 11. Respondent did not provide any evidence or

arguments that the removal was not wrongful either in her response or in the evidentiary hearing.

Given that the Child lived in Israel from the time she was born until Respondent brought her to

the United States in September 2011, a fact the parties stipulated to, the Court finds that the

Child was a habitual resident of Israel. *See Friedrich I*, 983 F.2d at 1400-02; *see, e.g., Simcox v.*

9

*Simcox*, 511 F.3d 594, 602 (6th Cir. 2007); *Tabacchi v. Harrison*, 99 C 4130, 2000 WL 190576, at * 9 (N.D. Ill. Feb. 10, 2000); *Steffen F. v. Severina P.*, 966 F. Supp. 922, 926 (D. Ariz. 1997); *Currier v. Currier*, 845 F. Supp. 916, 920 (D.N.H. 1994).

Having determined the habitual residence of the Child, the Court must look to the custody laws of that State to determine whether Petitioner has custody rights and whether they were breached. Hague Convention, art. 3; *Friedrich I*, 983 F.2d at 1402. The Israeli law relevant here, provided by Petitioner, is Israel's Capacity and Guardianship Law of 1962. (R. 1, Pet. at 11.) The law provides that parents, as the natural guardians of their minor children, have "the right to the custody of the minor, to determine his place of residence and the authority to act on his behalf." Capacity and Guardianship Law, 5722-1962, 16 LSI 106, 14-15 (5722-1961/62) (Isr.). As the Child's natural father, Petitioner has custody rights over her, which were breached by Respondent's retention of the Child past the agreed-upon time period. "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) (*Friedrich II*). No such acts are present in this case; in fact, by Respondent's own admission, Petitioner cared for the Child during the time periods when Respondent was in the United States and is a good father. (Tr. at 47-48.) Finally, Petitioner obtained an *ex parte* decision in the Beer Sheva Family Court in Israel declaring that Petitioner and Respondent have joint custody rights under Israeli law, and that Respondent's actions have violated Petitioner's custody rights. (R. 1, Pet., Ex. 1, FamC (BS)14421-03-12 *Walker v. Kitt* (Mar. 21, 2012).) Thus, the Court finds that Petitioner has met his initial burden and has

10

established a *prima facie* case of wrongful retention under the Hague Convention. The Court now turns to the affirmative defenses asserted by Respondent.

## II.    Article 13 "age and maturity" exception

Respondent requested an *in camera* interview of the Child pursuant to "the unnumbered exception" of Article 13 of the Hague Convention. (R. 32, Resp't Mot.) Respondent stated that since the Child has been in the United States, she "has continually expressed her objection to returning to Israel to live in the community." (R. 35, Am. Resp. to Pet. at 7.) Courts have authority to avoid ordering the return of a child "if the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views." Department of State, *Hague International Child Abduction Convention: Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 (March 26, 1986) (hereinafter "Dep't of State, *Text and Legal Analysis*"); *In re Robinson*, 983 F. Supp. 1339, 1343 (D. Colo. 1997). The party opposing the child's return must establish the child's maturity by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(A); *England v. England*, 234 F.3d 268, 272 n.5 (5th Cir. 2000). Petitioner did not object to, and indeed encouraged, an *in camera* interview with the Child. (R. 42, Pet'r Resp. to Resp't Mot.)

"As with the other Article 13 exceptions to the return obligation, the application of this exception is not mandatory. This discretionary aspect of Article 13 is especially important" because of the potential that the alleged abductor may influence the child. Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510. The Court must be careful not to give weight to the Child's opinion if she has been unduly influenced by the parent or another party. *In re Robinson*, 983 F. Supp. at 1343-44 (refusing to give weight to a ten-year-old's *in camera*

11

objection because of undue influence and suggesting, though not deciding, that the child was too young to have his views considered).

Whether to take the child's views into account involves a fact-intensive inquiry. *Simcox*, 511 F.3d at 604; *see Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (affirming the district court's finding that "despite her intelligence and demeanor," a ten-year-old did not have sufficient age or maturity for her views to be considered, and that her desire to remain in the United States was too generalized to be considered an objection to repatriation); *Blondin v. Dubois*, 238 F.3d 153, 167 (2d Cir. 2001) (rejecting the argument that any eight-year-old is too young for her views to be considered); *Anderson v. Acree*, 250 F. Supp. 2d 876, 883-84 (S.D. Ohio 2002) (finding that an eight-year-old was "of sufficient age and maturity" to have her views considered because, in an *in camera* interview, she could point to her native country on a globe, appeared to understand the judge's questions, and "indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth," and also because she did not seem to have been coerced or unduly influenced).

If the child is of sufficient age and maturity, her objection provides a ground separate from the rest of Article 13 upon which the Court may refuse repatriation. *Blondin*, 238 F.3d at 166. Additionally, the Court "may consider a younger child's testimony as part of a broader analysis under Article 13(b)." *Id.* (declining to question the district court's consideration of an eight-year-old's views because they were not the sole basis of the court's judgment).

Respondent did not provide the Court any reasons or evidence indicating that the Child should be considered of sufficient age and maturity to have her views considered. The Court conducted an *in camera* interview with the Child on October 11, 2012. The Child seemed to be

12

relatively at ease—although a little reserved, she was not too shy to volunteer that she had just returned from a class trip to a farm or to ask for candy she spied in a candy jar once the interview was finished. Overall, she seemed to the Court to be a relatively happy and carefree child. Her memories of life in Israel, though distant, were pleasant. She recalled playing with her siblings and spoke especially fondly of her "twin sister."[6] In closing, the Court asked the Child where she considered "home." The Child answered firmly and without hesitation, "in Israel." The Child said she had not been told what to say, and the Court finds this believable. The Child's perceptions and descriptions did not contain any adult language, nor did they sound rehearsed, and the Child responded quickly and simply to the questions posed—she did not seem to be recalling lines. Based on this *in camera* interview, the Court finds it unnecessary to determine whether the Child is of sufficient age and maturity to have her views considered because the Child did not give any indication that she would prefer to remain in the United States. Thus, Respondent's assertion of the "age and maturity" exception fails because the Child did not object to returning to Israel.

## III. Article 13(b) "grave risk" exception

Respondent contends that this Court should refuse to return the child based on Article 13(b) of the Convention. (R. 35, Am. Resp. to Pet. at 6.) Respondent believes "there is a grave risk that the child would be exposed to physical and psychological harm and that the child would be put in an intolerable situation" if the Court orders her return to Israel. (*Id.*) Article 13(b) allows a court to avoid ordering the return of a child where "there is a grave risk that his or her

---

[6] The Child is the only child of Respondent. Petitioner has a daughter with his first wife who was born within hours of the Child at issue here. (Tr. at 23.) The Court assumes this girl is the one the Child considers her "twin."

13

return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Respondent must prove the risk by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A); *England*, 234 F.3d at 270. Article 13(b) exceptions are to be narrowly construed. *England*, 234 F.3d at 270-71; *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995). To trigger the Article 13(b) exception, the potential harm to the child must be severe, *Nunez-Escudero*, 58 F.3d at 377, and the risk of that harm must be grave, "not merely serious," Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510. In a frequently-cited opinion, the Sixth Circuit explained that

> there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich II*, 78 F.3d at 1069. Article 13(b) is "*not* intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 (emphasis added).

Respondent contends, and introduced multiple witnesses at the evidentiary hearing to testify, that women are subordinate to men in the Community. (R. 35, Am. Resp. to Pet. at 2; R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff; Tr. at 26-27, 55-60, 68.) Respondent testified that the Child should stay in the United States where she will have better opportunities for education and self-expression than she would in the Community. (Tr. at 39-40.) Additionally, Respondent testified that she had been mistreated by Petitioner's first wife and treated as a servant in Petitioner's household. (R. 35, Am. Resp. to Pet., Ex. 2, Resp't Aff.) Respondent's mother, who

has lived in the Community at least part-time for 35 years, (Tr. at 55), expressed concern that as the daughter of Petitioner's second wife, the Child may not receive the same opportunities or affection as his other children. (Tr. at 59-60.)

The Court commends Respondent's desire to provide better educational opportunities for her daughter while admonishing her methods. However, the Article 13(b) exception is "not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child." Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510; *see also* Pérez–Vera Report at ¶ 116. The lack of opportunities available to women in general and children of second wives more specifically does not approach a "grave risk of harm" or an "intolerable situation" for the purposes of the Convention.

General evidence that the Child *may* be subject to a grave risk or placed in an intolerable situation is not sufficient, nor is evidence of conflict between the parents. Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 ("Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination."); *see, e.g.*, *Nunez-Escudero*, 58 F.3d at 376-77 (holding that evidence that the child's father refused to acquire a car seat and that the child's grandfather hit his child with a wooden plunger, and the mother's affidavit that she was physically, sexually, and verbally abused by the child's father, were insufficient to prove there was a grave risk to the child); *March v. Levine*, 136 F. Supp. 2d 831, 848 (M.D. Tenn. 2000) (holding that "[m]uch more is required under the case law to

15

establish this exception of grave risk of harm to the children by clear and convincing evidence" than the father's alleged abuse and alleged killing of the mother, which was not alleged to have happened in front of the children or be known to them). Here, the allegations that Petitioner's first wife mistreated Respondent, while unfortunate, have no bearing on the determination of whether the Child faces a grave risk if she returns to Israel. The Court's focus is limited to the consideration of grave risks that may actually exist for the individual Child. *Currier*, 845 F. Supp. at 923. Respondent has made no allegation that Petitioner or his wife or children have ever mistreated the Child or another individual. To the contrary, Respondent's mother testified that the only mistreatment she knows of is that Petitioner's first wife told the Child her mother left her and didn't want her.[7] (Tr. at 62.) Respondent and every witness who personally knows Petitioner testified that he is a good father. (Tr. at 29, 48, 60.)

The Court does not condone the subordination of women. Given the testimony about the lack of meaningful educational opportunities and the limited roles available for women in the Community, the Court empathizes with Respondent's desire to raise her daughter in the United States. However, where the Child may be better off is a custody matter, which is reserved for the courts in the country of her habitual residence. *See Friedrich II*, 78 F.3d at 1068. Article 13(b) is not license for the Court to decide where the child would be happiest or make a determination of her best interest. *Id.* at 1068; *March*, 136 F. Supp. 2d at 843-44. Instead, the Court is only to determine whether the Child will face immediate and substantial risk of an intolerable situation in the time period between repatriation and the determination of custody by the courts in Israel.

---

[7] Although this is a heartbreaking statement to make to a child, it does not approach the type of severe abuse and neglect to which Article 13(b) applies.

*Simcox*, 511 F.3d at 607; *Nunez-Escudero*, 58 F.3d at 377.

The Court must reluctantly conclude that returning the Child to a community that may only ever afford her second-class status because of her gender does not pose a grave risk of harm as intended by Article 13(b) of the Convention. Respondent testified that she believes Petitioner is a good father; that she believes he will protect the Child from harm; that he has never abused or neglected the Child or any of his other children; that Respondent feels comfortable with the Child visiting and staying with Petitioner; and that she has never had any reason to contact the police or social services about Petitioner. (Tr. at 48-50.) The testimonies of both parents, and indeed of the Child herself, leave the Court without any doubt that the Child will be physically and emotionally protected by Petitioner, and by Respondent, should she choose to return to Israel, pending the resolution of custody in an Israeli court of law. We can expect that Respondent will raise her concerns about the Child's future in the Community during the custody proceedings in Israel and that the Israeli courts will carefully consider her views in making their determination. *See* Pérez–Vera Report at ¶ 34.

## IV.    Article 20 exception

Finally, Respondent appeals to the exception provided in Article 20 of the Hague Convention. (R. 35, Am. Resp. to Pet. at 7.) Article 20 states that "[t]he return of the child . . . may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20. Respondent contends that "[p]olygamy is illegal in the United States without exception. And molestation and the subjection of women are considered to be against the fundamental principles of this society." (R. 35, Am. Resp. to Pet. at 7.) Respondent goes on to argue that

17

even if Israel has laws with respect to those behaviors, "the government acquiesces, at least in the polygamy realm." (*Id.*) Later, Respondent filed a supplemental brief alleging that "[e]qual protection of women is a fundamental principle in the United States." (R. 52, Resp't Mot. for Leave to File Suppl. Br.) Respondent argues that because "[t]he principles and practices of this community are anathema to the fundamental principles of the United States relating to the protection of human rights and fundamental freedoms of women," the Child's "future prospects in this community will be affected negatively by the role designated to women." (*Id.*) Finally, Respondent suggests that the facts that all adults in the Community pledge yearly oaths of allegiance and obedience to the leader and that the Child "may inevitably have to pledge oaths and submit to the wishes of the leader" might "utterly shock the conscience" of the Court. (*Id.*)

Respondent has the burden of proving an Article 20 exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A); *Friedrich II*, 78 F.3d at 1067. This defense is meant to be "restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002) *aff'd sub nom Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002) (internal quotations omitted); *see also Aldinger v. Segler*, 263 F. Supp. 2d 284, 290 (D.P.R. 2003) ("Article 20 . . . is directed to concerns about harms arising from the child's return to a particular country. Article 20 envisioned a limited situation where human rights concerns, most likely defined within the parameters of other international agreements, would prohibit return."). Respondent has utterly failed to provide clear and convincing evidence that the return of the Child to Israel would "shock the conscience."

Both Respondent and the Court were unable to find a single decision from a court in the

18

United States in which a child was not repatriated based on Article 20. Respondent's counsel admitted failure to find precedent but argued that "there has to be a case where [Article 20] does apply." (Tr. at 89.) This case is not it. While polygamy is certainly illegal in this country, and the systemic subordination of women is incompatible with the United States' aim of equality, "the Convention requires that the fundamental principles of the State *not permit* the return of the child; merely offending principles espoused in [United States] laws is insufficient." *Habrzyk v. Habrzyk*, 759 F. Supp. 2d 1014, 1027 (N.D. Ill. 2011); Pérez–Vera Report at ¶ 118. In response to the Court's request to provide any case that sustained an Article 20 defense, (Tr. at 90), Respondent directed the Court to the unpublished opinion in *Mohamud v. Guuleed*, 09 C 146, 2009 WL 1229986, at *4 (E.D. Wis. May 4, 2009). (R. 51.) Despite the low persuasive value of an unpublished decision from a court that did not have jurisdiction under the Hague Convention (because the child turned sixteen while the petition was pending), Respondent urges the Court to rely on dicta indicating that the *Mohamud* court would have denied the petition on Article 20 grounds. (R. 52, Resp't Mot. for Leave to File Suppl. Br.) Respondent's reliance on *Mohamud* is misplaced because the decision misapplies Article 20. Article 20 is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Dep't of State, *Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510. The *Mohamud* decision misused Article 20 as a vehicle for litigating custody, stating that "[a] fundamental freedom guaranteed by the Constitution and treaties of the United States is the right of a parent to the custody, care and control of a minor child as against third parties." 2009 WL 1229986, at *4. The court did not have jurisdiction under the Hague Convention but if it had, it would only have had jurisdiction to determine the forum in which the

19

extent of the mother's custody rights would be resolved, not to actually determine the extent of the mother's custody rights. Concluding that a parent's right to custody is a fundamental freedom sufficient to sustain an Article 20 defense defeats the purpose of the Convention—to recognize States' jurisdiction to determine and enforce their own custody rights and laws. Hague Convention, art. 1(b).

Here, Respondent asks the Court to use Article 20 to pass judgment on the culture and political system of the country from which the Child was removed. Respondent's Article 20 arguments focus on the role women play in the Community generally and speculate about what the Child's future life as an adult woman in the Community may be like. (R. 52, Resp't Mot. for Leave to File Suppl. Br.; R. 7, Am. Resp. to Pet. at 7-8.) The narrow jurisdiction of this Court, however, is limited to determining if any defense exists to the mandatory repatriation of the Child for the purposes of custody proceedings in Israel. Unfortunately, the fact that the Child may not have as robust rights as a man when she reaches maturity does not shock the conscience under Article 20. Cultural gender inequality is a serious issue. However, accepting cultural gender inequality as a sufficient basis for an Article 20 defense would undermine the Convention. To invoke Article 20 to refuse to return a child for anything less than gross violations of human rights would seriously cripple the purpose and effectivity of the Convention. Pérez–Vera Report at ¶ 34. The Court finds that Respondent has failed to provide the clear and convincing evidence necessary in asserting an Article 20 defense.

## CONCLUSION

For the foregoing reasons, the Court finds that Respondent wrongfully retained the Child in the United States, and that Respondent failed to meet her burden of establishing either  the

"age and maturity" or "grave risk" defenses under Article 13 of the Convention, or the "fundamental principles" defense under Article 20. Accordingly, the Court finds that the Child must be returned to Israel and grants Petitioner's Petition for Return of the Child (R.1).

The Clerk of the Court is directed to enter a final judgment in favor of Petitioner against Respondent.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: October 24, 2012**